# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
September 14, 2004 Session

## STATE OF TENNESSEE v. ERIC MATTHEWS

**Appeal from the Criminal Court for Shelby County**
**No. 00-05029     James C. Beasley, Jr., Judge**

---

**No. W2004-00274-CCA-R3-CD  - Filed October 25, 2004**

---

The defendant, Eric Matthews, was charged by the Shelby County Grand Jury in two separate indictments with especially aggravated kidnapping, a Class A felony, aggravated kidnapping, a Class B felony, and two counts of aggravated rape, a Class B felony, based on events involving the victim, V.T.,[1] that occurred on August 14, 1999, in the Whitehaven area of Memphis. Following his 2003 trial,[2] he was acquitted of the rape counts and convicted in both the especially aggravated and aggravated kidnapping counts of the lesser-included charge of kidnapping, a Class C felony. Applying four enhancement and no mitigating factors, the trial court sentenced the defendant as a Range I, standard offender to concurrent terms of five years in the county workhouse. In a timely appeal to this court, the defendant challenges both the sufficiency of the evidence and the sentencing imposed. Based on our review of the record and applicable law, we conclude that the evidence is sufficient to sustain the convictions but that the trial court erred by failing to merge the kidnapping convictions into a single judgment of conviction. We further conclude that three of the four enhancement factors were applied in error under the United States Supreme Court's recent decision in <u>Blakely v. Washington</u>, 542 U.S. ___, 124 S. Ct. 2531 (2004), which was released after the sentencing was imposed in this case. Accordingly, we affirm the convictions, but order that they be merged into a single conviction and modify the sentence imposed from five to four years, to be served in the county workhouse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed as Modified**

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA McGEE OGLE, J., joined.

Brett B. Stein, Memphis, Tennessee, for the appellant, Eric Matthews.

---

[1] It is the policy of this court to refer to victims of sexual assault by initials only.

[2] The long delay between the indictment and trial was caused, in part, by the fact that the defendant failed to appear at an October 2001 trial date and was not rearrested until December 2002.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Hagerman and Michael McCusker, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

### State's Proof

Memphis Police Officer Josephine Denise Jones testified she went to 5400 Hudgins Street, the site of an apartment complex in Whitehaven, at approximately 6:00 a.m. on August 14, 1999, in response to an eyewitness report of an African-American male dragging a half-nude female into an abandoned apartment. When she exited her patrol car, she saw the victim, who was naked from the waist up, run from an apartment building toward her screaming for help and an African-American male flee from the building. Officer Jones testified a second officer pursued and captured the suspect, while she remained with the victim to conduct her preliminary investigation.

Linda Davis testified she lived on the ground floor of a four unit apartment building located at 5493 Hudgins in Whitehaven, in which the two upstairs units had been occupied on August 14, 1999, but the other downstairs unit, located across the hall from her apartment, had been vacant. She said she was visiting with a friend in her apartment very early that morning when she heard the apartment building's common doors slam shut and a man say, "Come back here." Curious because she had not heard the sound of footsteps on the stairs, she looked out her living room window and saw clothing on the ground below. As she was joking about the sight with her friend, she heard a woman scream, looked out her back door, and saw two naked men carrying a naked woman into the next apartment building.

Davis testified that fifteen to twenty minutes later she saw the taller of the two naked men return to her building, enter the vacant apartment, come out dressed, and run off. Next, the second man, whom she recognized from the neighborhood and later identified as the defendant, went into the same apartment, came out dressed, gathered the clothing from the ground outside, and returned to the building next door. Davis testified she was initially unsure whether to call the police, but twenty-five to thirty minutes after the men carried the woman into the building, she called 9-1-1 and reported the incident. She made a positive courtroom identification of the defendant and identified the audiotape of her 9-1-1 call, which was played before the jury and admitted as an exhibit. Davis acknowledged she heard nothing unusual and was unaware of anyone in the abandoned apartment until she heard the doors to her apartment building slam shut that morning.

Memphis Police Officer Kedzie White testified he was dispatched to the Presidential West Apartments in Whitehaven on the morning of August 14, 1999, in response to a 9-1-1 call that two young men were dragging a naked woman into a vacant apartment. When he arrived, the victim, who was naked and obviously distraught, ran up to him from an apartment, reported what had

-2-

happened, and pointed to the defendant. Officer White testified the defendant ducked between the buildings and fled when the victim pointed him out, but White and two fellow officers managed to capture him in an abandoned apartment minutes later.

The victim testified she and a friend, Vanessa Williams, were visiting Williams' boyfriend at his house in Whitehaven on the evening of August 13, 1999, but left at about 11:30 or midnight after he and Williams got into a fight. She said she and Williams were walking toward their homes in South Memphis when two African-American men she did not know pulled up beside them in a car and offered a ride. Williams spoke to the driver, whom the victim later identified as the defendant, and then called to the victim that they had a ride. She and Williams then got into the vehicle's backseat and the defendant began driving. She soon noticed, however, that he was headed in the wrong direction. When she pointed it out, the defendant's companion in the front passenger seat showed her a gun and one of the men said, "Bitch, shut up, you-all fixing to go take care of us."

The victim testified she cried and begged the men to take her home, but they instead pulled in front of some apartment buildings and forced her and Williams at gunpoint into a vacant apartment. She said some young men in the next apartment, who were obviously friends of the defendant, came to the apartment door, got something from the defendant, and asked to be let in but were turned away. Next, the defendant's companion took Williams to the back room and raped her, while the defendant kept her with him in the living room, forced her to remove her clothes, and repeatedly raped her, both orally and vaginally. The victim testified that one of the defendant's friends tapped on the living room window as the defendant was raping her, but the defendant ignored him.

The victim testified that as the defendant forced her to perform oral sex, he struck her on the side of the head, drank alcohol and snorted cocaine, and described what he was next going to do to her. She said the men switched at one point, and the defendant's companion raped her while the defendant raped Williams. At a later point when the defendant was bragging to her about how tough he was, Williams came out of the back room, pleaded in tears to be turned loose, and then suddenly bolted out the door. The victim stated she ran out behind Williams, coming out of her t-shirt when one of the men grabbed at her as she fled out the door. She testified that Williams managed to escape but that the men caught up with her after a block, beat her when she refused to stop struggling, carried her into the bushes, and forced her to perform oral sex on one of them again. The men next ordered her to put her clothes on so they could return her to the apartment, but when she pleaded to be taken anywhere but there, fearing she would be killed inside the apartment, they carried her into the hallway of an apartment building, where they again took turns raping her, both vaginally and orally.

The victim testified the defendant threatened to kill her if she came out of the hallway. Nonetheless, when she saw a police car drive by, she ran toward it, screaming for help. The defendant and his companion fled at that point, but she pointed the defendant out to the police and identified him again when he was brought back to the scene in a patrol car. The victim acknowledged she did not see a gun after she ran out of the vacant apartment. She insisted, however,

that she remained frightened of both men throughout her ordeal, as well as of their friends, who appeared to her to want to participate in the rape. The victim denied she drank alcohol or used cocaine with the defendant, heard Williams agree for them to have sex with the men in exchange for money or drugs, or consented to intercourse with either man. She testified she never felt free to leave the apartment.

Pat Speck, the coordinator of nursing services at the Memphis Sexual Assault Resource Center, testified a general forensic exam was performed on the victim on August 14, 1999. The victim had abrasions on her right hip and shoulder, but there was no trauma noted on her genital and anal examinations. However, Speck testified that in her experience as a forensic nurse, it was uncommon for women complaining of vaginal rape to show injuries to the vaginal area.

**Defense Proof**

Twenty-four-year-old Travis Davis testified that the defendant was his cousin. He said he and a friend, Barry Singleton, were drinking beer outside the Presidential West Apartments at approximately 4:00 or 5:00 a.m. on August 14, 1999, when the defendant and Desmond Fraser, a friend from the neighborhood, accompanied by two African-American women, pulled up in front of the apartment buildings in a small hatchback car, exited the vehicle, paired up, and walked laughing, talking, and drinking into an empty apartment inside the building. Davis testified the women walked willingly into the apartment. He said he did not see any weapon.

Davis testified he and Singleton finished their beer and then looked in the living room window of the apartment, where they saw the defendant and his friend having sex with the women. They next went to the apartment's door, knocked, and asked the defendant to give them his car keys so they could listen to the radio. Davis said that after sitting in the car and listening to the radio for a while, he gave the car keys to Singleton with instructions to return them to the defendant and left. He acknowledged he and Singleton drank and smoked marijuana with the defendant and Fraser in the empty apartment before the defendant and Fraser left to get the women, but denied it was ever his intention to join the defendant and Fraser in having sex with the women.

Eighteen-year-old Barry Singleton testified he, Davis, the defendant, and "Desmond" rode around in the defendant's uncle's car until the defendant and Desmond let him and Davis out and went to get some girls. He said that about an hour later, he and Davis were "chilling" outside the Presidential West Apartments when the defendant and Desmond returned with two women, got out of the car, and walked with them, "coupled up drinking," "laughing and joking" into a vacant apartment in the building. Davis testified he and Singleton looked through the window and saw both couples having sex in the living room. Afterwards, Davis went and got the defendant's car keys, and he and Davis sat in the car and listened to the radio for a few minutes, until someone came with a message from Singleton's mother that she was looking for him. Singleton testified he left at that point and did not return. He denied there was any plan for the defendant to bring the women back for all four of them. He further denied he drank alcohol, used drugs, or was in the vacant apartment that night.

The twenty-eight-year-old defendant testified he, Singleton, Davis, and "Desmond" met up at about 11:30 p.m. or 12:00 a.m. on August 13-14, 1999, and rode around drinking beer in his cousin's car until approximately 12:30 or 1:00 a.m., when he and Desmond agreed to go get some girls. After dropping the others off outside the Presidential West Apartments, he and Desmond drove to South Memphis and began "riding the whore track." When he spotted two women on Latham and Vaughn, he pulled up, told the women that they were "trying to kick it for the night," meaning they wanted to pay the women for sexual intercourse, and that they had $10 and beer.

The defendant testified one of the women responded by saying "cool," and both women got into the backseat. He said that on the drive back to Whitehaven, he stopped at a house the victim pointed out, where she used the $10 he had given her to buy some crack cocaine, and at a liquor store where he bought a half-pint of "Hennessey." Upon their arrival at the apartment building, he told Davis that he and Desmond were going to "kick it for a while" and that Davis and Singleton should wait for them outside. The defendant and Desmond then went into the vacant apartment with the women. The defendant testified the women went willingly; neither he nor Desmond had or displayed a gun.

The defendant testified he, Desmond, and the women smoked cigarettes and drank alcohol in the living room for a while. Afterwards, Desmond took the victim's friend into the back room for sex, while he remained in the living room to have sex with the victim. He said the victim was performing oral sex on him when Davis and Singleton tapped on the window, laughing and pointing, and then came to the door to get his car keys. After he had handed the keys over, the victim resumed performing oral sex on him until she complained that her jaw was tired. He then smoked a cigarette while the victim smoked crack cocaine. About ten minutes later, he and Desmond switched partners for about fifteen minutes, before switching back to their original partners.

The defendant testified the victim was again performing oral sex on him when her friend came out of the back room, complained she needed to get home to her children, and suddenly ran out, despite his having told her he would take her home in a minute. He said the victim immediately ran out after her, followed by Desmond, who chased the women all the way down the street before catching the victim and dragging her back to the apartment. According to the defendant, he was half-way to his cousin's house, having decided to leave when Desmond ran after the women, when he realized he had left his identification behind. By the time he returned, Desmond had dragged the victim into the apartment hallway. He testified the victim was in the hallway, he was on the porch, and Desmond was around the corner looking for his identification, which he too had left behind, when the police arrived. At that point, the defendant said he walked around the corner and started home.

The defendant denied he ran from police. He further denied he took part in chasing the victim or dragging her back to the apartment, but said he would not characterize Desmond's actions in doing so as "kidnapping." He testified he thought he had smoked crack cocaine earlier in the evening, but denied having smoked any with the victim. He said he lied in his original statement to police, saying that no one else was involved in the incident, in order to protect his companions, who

had not been caught. Finally, he emphatically denied that he and Desmond had used a gun to kidnap the women and bring them back to the apartment to be raped, testifying: "No. You don't rape a crack head. What you rape a crack head for? Piece of crack she'd do the whole courtroom. What you got to rape a crack head for? Come on get real."

When asked by the trial court to make an election with respect to the aggravated rape counts of the indictment, the State chose the first vaginal rape that allegedly occurred in the living room of the vacant apartment by the use of a deadly weapon, and the latter vaginal rape that allegedly occurred in the hallway with both men after the victim had been captured on the street and dragged back to the apartment. After deliberating, the jury convicted the defendant of the lesser-included offense of kidnapping in both the aggravated and especially aggravated kidnapping counts of the indictment, but acquitted him of both counts of aggravated rape.

### Sentencing Hearing

The sole evidence introduced at the defendant's sentencing hearing was his presentence report, which reflected three prior adult misdemeanor convictions for resisting arrest, disorderly conduct, and the possession, manufacture, or sale of drugs. The trial court applied four enhancement factors: the defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the range; the defendant was a leader in the commission of an offense involving two or more criminal actors; the defendant treated or allowed the victim to be treated with exceptional cruelty during the commission of the offense; and the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement. Tenn. Code Ann. § 40-35-114(2), (3), (6), (8) (2003).

The trial court based the application of enhancement factor (2) on the defendant's criminal record and testimony he had used cocaine; enhancement factor (3) on evidence that a codefendant had been involved in the incident, which had also involved separate victims; enhancement factor (6) on evidence that the victim was subjected over the course of the long ordeal to "several different sexual advances" by the defendant, was threatened and intimidated by him, was beaten, kicked, and made to perform oral sex in the bushes, and was dragged back to the hallway for sexual intercourse with both men again; and enhancement factor (8) on evidence that the intercourse took place over several hours in multiple locations with both men, involved multiple sex acts, and occurred, in part, while the defendant was snorting cocaine, drinking cognac, and boasting to the victim about his "manhood."

When defense counsel questioned the trial court's application of the latter enhancement factors in light of the fact that the jury had acquitted the defendant of the rape and aggravated kidnapping charges, the trial court responded:

> THE COURT: Well, I think it's my ruling, [defense counsel],
> was that if I accepted [the defendant's] version, apparently, the jury
> accepted [the defendant's] version, that this is a contractual

-6-

agreement between [the victim] and [the defendant], and in my opinion, he abused the contractual agreement and went way above and beyond whatever the contractual agreement was in the way that he mistreated her and the way that he behaved with regard to her, and my opinion justifies the sentence –

[DEFENSE COUNSEL]: Very well, Your Honor.

THE COURT: -- not the fact that he forcefully had sex against her, but because the jury has already ruled on that, but the fact of the kidnapping with the way in which she was detained, dragged back under the circumstances and further the fact that the gratification was the changing of partners back and forth, in and out, having sex with her in three or four different locations over a multiple-hour period of time, those are the things the Court's considering.

Finding no applicable mitigating factors, the trial court enhanced the defendant's sentences from the presumptive minimum of three years to five years, based on the above four enhancement factors, and ordered that the sentences be served concurrently in the county workhouse.

## ANALYSIS

### I. Sufficiency of the Evidence

As his first issue, the defendant challenges the sufficiency of the evidence in support of his kidnapping convictions. When the sufficiency of the evidence is challenged, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight

-7-

> and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant's only argument on this issue consists of his statement that "based upon the alleged victim's testimony, a rational trier of fact could not have found the appellant guilty beyond a reasonable doubt." The State argues the proof presented at trial was sufficient to sustain the jury's verdicts, in that evidence was offered that the defendant unlawfully confined the victim so as to substantially interfere with her liberty and his actions exposed her to substantial risk of bodily injury and/or subjected her to a condition of involuntary servitude.

Kidnapping occurs when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty" "(1) [u]nder circumstances exposing the other person to substantial risk of bodily injury; *or* (2) [w]here the confinement of another is in a condition of involuntary servitude." Tenn. Code Ann. §§ 39-13-302(a); -303(a) (1997) (emphasis added). However, in this case the trial court apparently instructed the jury only as to the alternate "substantial risk of bodily injury" portion of the definition.[3]

We conclude that a rational jury could have found the elements of kidnapping beyond a reasonable doubt from the proof presented at trial. Viewed in the light most favorable to the State, the evidence established that, regardless of any contractual arrangement the defendant may have had with the victim for sexual intercourse, he held her in the apartment against her will after she and her friend had clearly expressed their desire to leave, chased her when she fled the apartment, caught her a block away, and then dragged her back to the hallway, where he prevented her from leaving until the arrival of the police. The defendant's actions with his accomplice, in grabbing at the victim when she ran from the door and dragging her down the street back to the apartment, necessarily exposed her to substantial risk of bodily injury, and the proof at trial showed she did, in fact, sustain bruising to her shoulder and hip during the ordeal. We, therefore, conclude that the evidence is sufficient to sustain the defendant's kidnapping convictions.

Although not raised by either party, we note that the trial court failed to merge the kidnapping convictions, in spite of indicating at the conclusion of trial that it would do so. The record reflects

---

[3] Although the trial court's actual instructions to the jury were not transcribed, the typewritten jury instructions included in the record reflect that the court instructed the jury that the essential elements of kidnapping were: "(1) that the defendant removed or confined another unlawfully so as to interfere substantially with the other's liberty; and (2) that the removal or confinement was under circumstances that exposed the other to substantial risk of bodily injury; and (3) that the defendant acted knowingly."

that the especially aggravated kidnapping count of the indictment alleged the defendant's use of a firearm to accomplish the kidnapping, and the aggravated kidnapping count alleged he committed the kidnapping to facilitate the felony of rape. Kidnapping is a continuing offense. State v. Legg, 9 S.W.3d 111, 117 (Tenn. 1999) ("So long as the removal or confinement of the victim lasts, the offense of false imprisonment continues.") Notwithstanding the victim's attempt to escape, the defendant's actions in confining the victim constituted a continuing course of conduct and, as such, a single kidnapping offense. Therefore, the trial court should have merged the separate convictions into a single judgment of conviction. See State v. Billy Harris, No. W2003-01911-CCA-R3-CD, 2004 WL 1765532, at *7 (Tenn. Crim. App. Aug. 4, 2004) (citations omitted) (noting that a merger of convictions is appropriate in order to protect against double jeopardy when jury convicts a defendant under alternate theories of same offense).

## II. Sentencing

The defendant next contends that the trial court erred by applying enhancement factors based on facts alleged in the more serious offenses with which he was charged rather than the lesser-included offenses of which he was found guilty. The State responds by arguing that the defendant has waived the issue by including only a generic and general argument in his brief. The State further argues that all four enhancement factors were supported by the record and appropriately applied by the trial court. However, in light of the United States Supreme Court's recent decision in Blakely v. Washington, 542 U.S. ___, 124 S. Ct. 2531 (2004), we need not delve into the specifics of the State's arguments on this issue. In Blakely, the Court applied the rule earlier announced in Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), to conclude that a criminal defendant's Sixth Amendment right to trial by jury encompasses the right to have the jury, rather than the judge, determine the existence of any sentence enhancements other than those based on facts reflected in the jury verdict or admitted by the defendant. Blakely, 542 U.S. at ___, 124 S. Ct. at 2536-38.

In this case, enhancement factors (3), (6), and (8) were based on facts that were neither admitted by the defendant nor reflected in the jury verdicts. Thus, we conclude that the only enhancement factor appropriately applied under Blakely was enhancement factor (2), which was based on the defendant's prior convictions and his admission at trial to having used illegal drugs. We further conclude that the presence of the applicable enhancement factor, combined with the absence of any applicable mitigating factors, justifies an enhanced sentence of four years. In accordance with this determination, we modify the defendant's five-year sentence to four years, to be served in confinement as ordered by the trial court.

## CONCLUSION

We conclude the evidence is sufficient to sustain the kidnapping convictions, but that the trial court erred by failing to merge the separate convictions into a single judgment of conviction. We further conclude that because three of the four enhancement factors were inappropriately applied, the defendant's sentence should be modified to four years. Accordingly, we affirm the defendant's

conviction, reduce the sentence from five to four years, and remand to the trial court for further proceedings consistent with this opinion.

_____
ALAN E. GLENN, JUDGE